Ex parte YORK COUNTY NATURAL
GAS AUTHORITY, Petitioner.

In re Outstanding Bonds, Series of 1957,
1958, 1959, and 1960, Payable Solely
From Revenues.

No. B/2075.

United States District Court
W. D. South Carolina,
Rock Hill Division.

Feb. 10, 1965.

C. W. F. Spencer, Jr., Rock Hill, S. C., Huger Sinkler, Charleston, S. C., petitioner.

James P. Mozingo, Darlington, S. C., pro se and for Certain Bondholders.

HEMPHILL, District Judge.

Petitioner, seeking approval of its proposed plan of composition of outstanding indebtednesses allegedly in default, exhibited, on August 25, 1964, its petition, together with exhibits and references, alleging justification of same.[1] The action is pursued under the provisions of Title 11, Chapter 9, United States Code. This Chapter, formerly known as Chapter X of the Bankruptcy Act, insofar as sections 401–404 thereof are concerned, have been declared valid and constitutional by the Supreme Court of

---

1. Petition for filing of Plan of Composition and Order permitting the filing are incorporated herein and made a part hereof as Appendices I and II hereof.

the United States. See United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137. The United States Constitution confers the power on Congress to enact necessary statutes.[2] Title 28, United States Code, § 1334 provides: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of all matters and proceedings in bankruptcy."

■ The fact that the Constitution allows and the National Legislature enacts *in accordance with its authority,* however, does not enlarge the authority of those seeking relief to exceed the limitation imposed by statute.[3] Within those limits this Court may proceed to render interlocutory decree, retaining such jurisdiction as may be necessary to implement, or carry out the provisions or directions of such decree.[4] With such in mind this Court accepted and assumed jurisdiction.

York County Natural Gas Authority was originally created by the General Assembly of South Carolina in 1954,[5] the Act was later amended April 6, 1957[6] to function under changed circumstances which effectually substituted Carolina Pipeline Company as supplier of gas in place of Transcontinental Gas Pipeline Corporation. Pertinent parts of the Act as amended are:

"SECTION 1. Section 1 of Act 959 of 1954, amended—York County Natural Gas Authority created.— Section 1 of Act No. 959 of the Acts of 1954, is amended to read as follows:

"Section 1. There is hereby created a body corporate and politic of perpetual succession to be known as the York County Natural Gas Authority (hereinafter sometimes referred to as the authority). It shall be the function of the authority to purchase, lease, acquire, build, construct, maintain and operate natural gas distribution systems within the service area hereinafter defined and such transmission lines as may be necessary to transport natural gas to the distribution systems from the transmission lines to be constructed by Carolina Pipeline Company or other sources from which natural gas may now or hereafter become available, which transmission lines and distribution systems will serve persons, firms, corporations, municipal corporations, and any subdivision or division of the State located in and nearby to each of the incorporated municipalities of Clover, York, Rock Hill, Fort Mill or any other municipality or thickly populated area in York County. The transmission lines, distribution systems, their component parts, all apparatus, equipment and property incident thereto or used or useful in the operation thereof, and all additions, improvements, extensions and enlargements to any of the same, shall henceforth be referred to collectively in this act as the system. The authority shall have the further functions and duties prescribed by this act, and shall have all of the powers herein granted.

"SECTION 2. Service area further.—The Authority shall be empowered to furnish natural gas service throughout the County of York, and, for the purposes of this Act, the area of such county shall constitute the Service Area of the Authority.

\*　　\*　　\*　　\*　　\*

2. Art. 1, § 8, cl. 4 provides: "The Congress shall have power to \* \* \* to establish \* \* \* uniform laws on the subject of Bankruptcy throughout the United States."

3. Chicot County Drainage Dist. v. Baxter State Bank, (8th Cir.) 103 F.2d 847; In Re South Beardstown Drainage & Levee Dist. (7th Cir.) 125 F.2d 13; In Re Summer Lake Irr. District (D.C. Ore.) 33 F.Supp. 504.

4. Buell v. City of Montague, (9th Cir.) 190 F.2d 1019.

5. 48 S.C.Stat. at Large #959 (p. 2652 et seq) approved 31 Mar. 1954.

6. 50 S.C.Stat. at Large #694 (p. 1426 et seq).

"SECTION 4. Powers and duties.
—— * * *

"a. To sue and be sued.

* * * * *

"c. To make bylaws for the management and regulation of its affairs, and to define a quorum for its meetings.

"d. To acquire, purchase, hold, use, lease, mortgage, sell, transfer and dispose of any property, real, personal or mixed, or any interest therein.

* * * * *

"e. To purchase, lease, acquire, build, construct, maintain and operate distribution systems within its service area and such transmission lines as may be necessary to serve the distribution systems and from time to time enlarge and extend such distribution systems and transmission lines.

* * * * *

"g. To enter into contracts of long duration for the sale of interruptible gas only, but all of such contracts shall contain a provision permitting the Authority to increase the price charged its customers for gas if the Authority, in turn, shall be required to pay more for its gas than it did on the occasion that such contract was entered into, and no contract of any sort shall be entered into which shall not in all respects be subordinate to any covenant or undertaking which the Authority may make in the proceedings taken in connection with the issuance of any bond or other obligation of the Authority. And, no contract of any sort shall be made respecting the sale of firm gas, which shall be sold in accordance with such schedule of rates as shall from time to time be in effect.

* * * * *

"1. To appoint officers, agents, employees and servants, prescribe the duties of such, fix their compensation, and determine if and to what extent they shall be bonded for the faithful performance of their duties.

"m. In its discretion, to employ any person or corporation to operate its System for any fixed period of time, upon such terms and conditions as the Authority may deem proper.

* * * * *

"o. To borrow money and to make and issue negotiable bonds, notes, and other evidences of indebtedness, payable from all or any part of the revenues derived from the operation of its System. The sums borrowed may be those needed to pay all costs incident to the construction and establishment of the System, and any extension, addition, and improvement thereto, including engineering costs, construction costs, the sum needed to pay interest during the period prior to which the System, or any extension, addition or improvement thereto, shall be fully in operation, such sum as is needed to supply working capital to place the System in operation, and all other expenses of any sort that the Authority may incur in establishing, extending and enlarging the System. Neither the faith and credit of the State of South Carolina, nor of the municipalities of Clover, York, Rock Hill and Fort Mill, in York County, shall be pledged for the payment of the principal and interest of the obligations, and there shall be on the face of each obligation a statement, plainly worded to that effect. Neither the members of the Authority, nor any person signing the obligations, shall be personally liable thereon. To the end that a convenient procedure for borrowing money may be prescribed the Authority shall be fully empowered to avail itself of all powers granted by Sections 59–361 through 59–415 and 59–651 through 59–682, Code of Laws of South Carolina, 1952, as now or hereafter constituted, it being the intent of

this provision that further amendments and modifications of these Code provisions shall be deemed to amend and revise correspondingly the powers granted by this paragraph. In exercising the powers conferred upon the Authority by such Code provisions, the Authority may make all pledges and covenants authorized by any provision thereof, and may confer upon the holders of its securities all rights and liens authorized by such Code provisions. Specifically, and notwithstanding contrary provisions in any of such Code provisions, if contrary provisions there be, the Authority may:

"(1) Provide that such bonds, notes or other evidences of indebtedness be payable, both as to principal and interest, from the net revenues derived from the operation of its System, as such net revenues may be defined by the Authority.

"(2) Covenant and agree that upon it being adjudged in default as to the payment of any instalment of principal or interest upon any obligation issued by it, or in default as to the performance of any covenant or undertaking made by it, that in such event the principal of all obligations of such issue may be declared forthwith due and payable, notwithstanding that any of them may not have then matured.

"(3) Confer upon a corporate trustee the power to make disposition of the proceeds from all borrowings and of all revenues derived from the operation of the System, in accordance with the resolutions adopted by the Authority as an incident to the issuance of any notes, bonds or other types of securities.

"(4) Dispose of all obligations at public or private sale, and upon such terms and conditions as it shall approve.

"(5) Make such provision for the redemption of any obligations issued by it prior to their stated maturity, with or without premium, and on such terms and conditions as the Authority shall approve.

"(6) Covenant and agree that any cushion fund established to further secure the payment of the principal and interest of any obligations shall be in a fixed amount.

\*　　\*　　\*　　\*　　\*

"(8) Prescribe the procedure, if any, by which the terms of the contract with the holders of its obligations may be amended, the number of obligations whose holders must consent thereto, and the manner in which such consent shall be given.

"(9) Prescribe the events of default and the terms and conditions upon which all or any obligations shall become or may be declared due before maturity and the terms and conditions upon which such declaration and its consequences may be waived.

"SECTION 5. Disposition of revenues.—All net revenues derived from the System, whose disposition the Authority shall not have covenanted or contracted to otherwise dispose of, shall be paid over to York County and to the municipalities which may from time to time be served by it, including the municipalities named and others that may later be served by the System of the Authority, such county receiving a share thereof in the proportion that the per annum consumption of gas outside of the incorporated areas therein bears, and each municipality receiving, a share thereof in the proportion that the per annum consumption of gas therein bears to the aggregate per annum consumption of gas by the entire Service Area of the Authority."

Petitioner, whose authority so to do is not here an issue, thereafter came into being by the appointment of personnel, various contracts, negotiations, building, etc., and issued revenue bonds,

with interest payable thereon, which, at time of commencement of this action had admitted status as follows:

(a) $2,762,000 of Natural Gas System Revenue Bonds, dated September 1, 1957, bearing interest at six separate rates, and varying from 5% to 5.80%, which has not been paid since the interest payment date of March 1, 1961, and is due from such date at the respective rates borne by such bonds.

(b) $450,000 of Natural Gas System Revenue Bonds, dated September 1, 1958, bearing interest at six separate rates, and varying from 5% to 5.80%, which has not been paid since the interest payment date of March 1, 1961, and is due from such date at the respective rates borne by such bonds.

(c) $422,000 of Natural Gas System Revenue Bonds, dated July 1, 1959, bearing interest at six separate rates, and varying from 5% to 5.80%, which has not been paid since the interest payment date of March 1, 1961, and is due from such date at the respective rates borne by such bonds.

(d) $144,000 of Natural Gas System Revenue Bonds, dated October 1, 1960, bearing interest at 6%, which has not been paid since the interest payment date of September 1, 1962, and is due from such date at the rate borne by such bonds.

In addition, Petitioner had borrowed to meet coupons due on the bonds as follows:

(e) $95,758 for moneys advanced to Petitioner by certain of those who purchased the Outstanding Bonds, used by Petitioner along with its own moneys available, therefore to meet the March 1, 1961 coupons on the Outstanding Bonds described in subparagraphs (a), (b) and (c) above.

It is over the composition of this indebtedness that this controversy ensues.

Despite the fact the obligations were in default since the payment of March 1, 1961, Petitioner has operated the system and continued expansion and development of the system, but it does not have the funds, in being, or in prospect to fully develop its alleged and hoped-for potential or to make improvements.

On March 6, 1964, the Governor of South Carolina approved Act #1373 of the Acts of the South Carolina General Assembly,[7] which empowered the Authority to refund its outstanding bonds, to fund its other indebtedness, to raise money for improvements, Sections 2 and 3 of which provided:

"SECTION 2. Authority may issue and exchange bonds.—The Authority is hereby authorized to issue, pursuant to Sections 59–651 to 59–682, inclusive, of the 1962 Code, such amount of bonds as it may from time to time hereafter deem necessary in order to exchange such bonds for those of the Authority now outstanding, and in order to provide funds for improvements and extensions to the system of the Authority. The bonds may be disposed of by the Authority on such terms as the Authority shall approve and at a discount, if the Authority shall find such a method to be to its advantage. The Authority is expressly empowered to employ such persons or firms of investment bankers as it may deem desirable in effecting the exchange of its outstanding bonds, and to use the proceeds of any bonds that might be sold to pay for the services of such individuals or investment bankers. The Authority is further authorized to issue funding bonds or certificates of indebtedness to such extent as it may deem necessary to fund all arrears of interest. Such funding bonds or certificates of indebtedness shall have such claim to the revenues of the system as the Authority shall provide.

"SECTION 3. Payment. — All bonds of the Authority now outstanding and the bonds and certifi-

7. 53 S.C.Stat. at Large #1373 (p. 3380).

cates of indebtedness of the Authority to be hereafter issued pursuant to the authorization of this and other acts relating to the Authority are hereby declared to be valid and binding obligations of the Authority according to their respective tenor and effect. Such bonds and certificates of indebtedness shall be payable solely from the revenues derived from the system of the Authority and shall have such claim thereto as shall be prescribed in the proceedings of the Authority providing for their issuance."

While this Court does not determine such act necessary to the proceeding hereunder,[3] there remains no question of the sanction of the State Authority.

On April 16, 1964, the Authority, pursuant to authority granted to it in the 1954 Act of the South Carolina General Assembly, supra, and the 1964 Act hereinabove set forth as sanctioning debt refunding or composition, unanimously passed "A Resolution Providing for the Issuance and Sale of Four Million Three Hundred Thousand Dollars York County Natural Gas Authority Refunding and Improvement Revenue Bonds dated March 1, 1964," contemplating as composition refunding:

(a) The issuance of $4,300,000 of Natural Gas System Refunding and Improvement Revenue Bonds of the AUTHORITY (the BONDS). The BONDS shall be dated March 1, 1964 and shall mature on March 1, 1994.

(b) The use of BONDS to the extent of $3,778,000 in exchange for the $3,778,000 of OUTSTANDING BONDS;

(c) The sale of $522,000 of BONDS to the INVESTMENT BANKERS in order to provide funds with which to pay expenses incident to the refunding plan and to pay for improvements and extensions to the SYSTEM; and

(d) The issuance of fully registered certificates of indebtedness (the CER-

TIFICATES), whose obligation shall be junior and subordinate to the BONDS, certain prior lien bonds authorized (but not issued) by the RESOLUTION, and bonds hereafter issued on a parity with the BONDS. Such CERTIFICATES will not bear interest and will be repayable only in the manner provided by the RESOLUTION.

The Resolution sets forth manner and means of bond exchange, and detailed such items as definitions, and other administrations incidental to, but not absolute on the issue of approval or disapproval now before the court.

Prior to the South Carolina Legislative Act of 1964, in anticipation of the necessity of re-financing, Petitioner had entered into a "Refinancing Agreement":

"STATE OF SOUTH CAROLINA COUNTY OF YORK } REFINANCING AGREEMENT

THIS AGREEMENT between the YORK COUNTY NATURAL GAS AUTHORITY, A Municipal corporation organized under the laws of the State of South Carolina (Hereinafter called the "Authority"), and HERBERT J. SIMS & COMPANY, INC., Investment Bankers, 52 Wall Street, New York, N. Y., and WATKINS, MORROW & COMPANY, Investment Bankers, Woodward Building, Birmingham, Alabama, (hereinafter referred to as the "Bankers"), WITNESSETH:

*RECITALS*

WHEREAS, the Authority has outstanding $3,778,000 Natural Gas Revenue Bonds; and

WHEREAS, The Authority is in default on the payment of principal and interest thereon; and

WHEREAS, it is in the best interest of the Authority and the Bondholders for a plan of refinancing to be worked

8. See United States v. Bekins, supra.

out which is acceptable to the Authority; and

WHEREAS, it is in the public interest for the Authority to employ financial consultants with many years of experience in financing of Natural Gas Revenue Bonds; and

WHEREAS, the Bankers have had many years of such experience;

NOW, THEREFORE, in consideration of $10.00 paid each to the other, receipt of which is hereby acknowledged, the parties hereto do hereby mutually contract and agree as follows:

1. THE BANKERS AGREE:

A. To accept employment as the exclusive irrevocable agent of the Authority, for the purposes and during the time herein set forth, and to use their best efforts to carry out the purposes of this Agreement.

B. To prepare a plan of refinancing of the indebtedness of the Authority. Such plan shall include, among other things, recommended rate or rates of interest for the Refunding Bonds, a plan for the Authority to generate cash funds for badly needed extensions and improvements, and a plan to handle bonds which the present owners may not be willing to exchange. A plan acceptable to the Authority must be submitted to the Authority by the Bankers within 30 days from date, failing which the Authority may elect to terminate this agreement by giving to the Bankers immediately effective notice in writing of such termination.

C. That the plan for obtaining cash for the Authority may include a purchase of Revenue Bonds by the Bankers. In such circumstances, the Bankers would be acting in somewhat of a dual capacity but with the approval of the Authority.

D. Upon approval by the Authority of the original or amended refinancing plan submitted, to use their best efforts to arrange a joint meeting with the known owners of large amounts of the presently outstanding Revenue Bonds of the Authority, within 30 days thereafter. Those in attendance would be representatives of the Authority, of the Bankers, of the Authority's Engineers, of the original leading underwriters of the bonds and of any principal bondholders designated by the Authority.

E. To furnish to the Attorneys of the Authority hereinafter mentioned the principal ingredients required for a new Resolution for such proposed financing program including, among other things, rate or rates of interest, maturity schedules, flow of funds of the Authority, redemption features, etc.

F. To charge for expenses and services a fee for bonds which may be exchanged under the refinancing program of 2½% of the principal amount of such bonds actually exchanged. Out of this amount will be paid the necessary fees to other investment Bankers, including if feasible and possible the original leading underwriters of the Bonds, for assisting in an exchange program.

G. To purchase for cash at 97½% of par plus accrued interest up to $1,000,000 principal amount of bonds. Such bonds shall either be those not exchanged or for cash for extensions or a combination of both. The rate or rates of interest on such bonds are to be mutually agreed upon at the time that the refinancing program is put into effect. Unless otherwise approved in writing by the Authority, not less than $500,000 of the $1,000,000 principal amount of bonds to be purchased for cash by the bankers shall be applied to payment of the costs of such extensions to and improvements of the existing gas system as may be designated by the Authority.

H. To consummate and put into effect the refinancing plan within 12 months from date of approval thereof, or either party hereto may cancel this Agreement by giving to the other immediately effective notice in writing

thereof. In the event that no Refunding Bonds or new bonds are issued, the Authority will owe the Bankers nothing for their services, regardless of the cause of such non-issue of Bonds.

I. That subject to approval by the Bankers of the adequacy and sufficiency of extensions and improvements proposed by the Authority, funds therefor in the amount of not exceeding $500,000 may be provided by the Authority, at its election, through issuance and sale to other than the Bankers of revenue bonds having parity with other bonds of the Authority issued and sold to the Bankers or exchanged with existing bondholders.

## 2. THE AUTHORITY AGREES:

A. To employ the Bankers as its exclusive irrevocable agent, for the purposes and during the time herein set forth, to use their best efforts to carry out the terms and intent of this Agreement.

B. To furnish without cost all resolutions, indentures of trust, etc., which may be required to legally authorize, issue and sell the proposed bonds.

C. To furnish without cost the approving legal opinion of Messrs. Sinkler, Gibbs & Simons, Attorneys, Charleston, S. C.

D. To furnish without cost the new bond blanks.

E. To pay the charges of the Bank acting as Depository and Trustee under the refinancing plan, after initially approving in advance the designation and the amount or basis of such charges.

F. To approve the Bankers acting as Agent and as Purchaser under such refinancing plan.

G. In the event that no bonds are issued, either for refinancing or for new money, then nothing is to be paid the Bankers for their services, regardless of the cause of such non-issue of Bonds.

H. In the event that the plan is not consummated within 12 months from date, then either party hereto may cancel this Agreement, by giving to the other immediately effective notice in writing thereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on this the 19th day of September, 1963.

YORK COUNTY NATURAL GAS AUTHORITY

By: /s/ W. Ben Dunlap
W. Ben Dunlap, Chairman

Attest: /s/ B. A. Lewis
B. A. Lewis, Secretary

HERBERT J. SIMS & COMPANY, INC.

WATKINS, MORROW & COMPANY

By: /s/ Hugh Morrow, Jr.
Authorized Representative"

The "Bankers", in turn, had submitted a proposed refunding plan:

HERBERT J. SIMS & CO., INC. Received 12–16–63

"YORK COUNTY NATURAL GAS AUTHORITY PROPOSED REFUNDING PLAN

In accordance with the Refinancing Agreement, Section 1, Paragraph B, dates September 19, 1963 between the undersigned and the York County Natural Gas Authority, South Carolina, we, your Bankers, propose that the Authority approve the following refinancing plan to be submitted to the Bondholders, subject to the approval as to legality by Messrs. Sinkler, Gibbs & Simons, Charleston, South Carolina.

*Details of Refunding Bonds*

1–Date of Issue: March 1, 1964

2–Maturity: March 1, 1994

3–Denomination: $1,000

4–Form: Coupon Bonds, Registerable

5–Call Features: Sinking Fund and Refunding @ 102 and interest on any interest payment date upon 30 days notice

6–Paying Agents: (a) Citizens & Southern National Bank (b) Co-paying agent Empire Trust Co., N. Y.

7–4% for 3 years, 4½% thereafter

*Method of Handling Total Past Due Interest*

1–Registered Bonds dated March 1, 1964, due March 1, 1995

2–Non-interest bearing Bonds

3–Record of registered holders in Citizens & Southern National Bank, Columbia, S. C.

4–Payments to be made proportionately to reduce face amount

5–Reregisterable so as to be transferable and marketable

*Bond Resolution*

1–Flow of Funds

(A) Daily deposits into Gross Revenue Fund

(B) Operating Expenses

(C) Balance of Revenues to Reserve Fund for a period of 3 years until maximum of $200,000 has been deposited (1) *

(D) Beginning in 4th year, 50% of balance to Reserve Fund until maximum of $200,000 has been deposited (2) *

(E) Beginning in 4th year, 50% of balance to Renewal and Extension Fund up to a maximum of $40,000 in any one year (2) *

(F) Balance to Bond Redemption Fund

(G) Beginning in the 10th year, 10% of the surplus or balance to make payments on registered bonds due March 1, 1995 after payment of interest and the annual maximum payment of $40,000 to the Renewal and Extension Fund and provided the Reserve Fund contains its maximum of $200,000

(H) After all Refunding Bonds have been paid on March 1, 1994, the balance remaining after payment of operating expenses and the maximum annual payment of $40,000 to the Renewal and Extension Fund, will be used to pay unpaid balance of the registered non-interest bearing Bonds due March 1, 1995

(1)* Or until new bond proceeds for construction are expended

(2)* To begin if new bond proceeds for construction are expended prior to estimated 3 year construction period

*Form of Refunding and Improvement Bonds*

1–Date of issue: March 1, 1964

2–Maturity: March 1, 1994

3–Denomination: $1,000

4–Form: Coupon Bonds, registerable

5–Call features in numerical order semi-annually (A) Sinking Fund March 1, 1969 @ 103 (B) Refunding March 1, 1974 @ 105¼, on any interest payment date thereafter

6–Interest rate: 5¼%

7–Payable from the same flow of funds as Refunding 4–4½% Bonds

*Miscellaneous Resolution Provisions to Modify Present Resolution*

1–No consulting engineer so long as Charles Stafford is employed by the Authority, unless one year's unaccounted-for-gas exceeds 10% excepting Force Majeur

2–Authority will choose Certified Public Accountants

3–Issue Equal Lien Bonds based on 2 previous years net revenues covering not less than maximum interest of present outstanding bonds and new bonds to be issued 2 times without any limitation by the registered bonds issued for past due interest

4–Deposit of surplus funds up to $50,000 in the Reserve Fund and up to $50,000 in the Operation and Maintenance Fund for operating capital, balance, if any, to the Reserve Fund

5—Annual budget to be approved by Bankers and/or Consulting Engineer

6—Resolution to permit issuance of transmission line bonds payable as an operating charge

7—After setting aside 3 months operating expense for use as capital, balance of cash on hand to be placed in Reserve Fund up to the maximum required

8—New Construction Fund monies until expended as additional security for payment of interest

9—Minimum interest coverages after completion of refunding: Year 1—110%, Year 2—120%, Year 3—130%, Year 4—140%, and thereafter—150%

10—Modification of Construction Fund clauses to conform to new consulting engineer clause

11—10% of the holders of outstanding bonds may sue

*Procedure and Technique of Refunding*

1—Bonds to be exchanged number for number

2—A specified number of bonds must be called annually prior to purchase or call for tenders by the Authority

3—Upon agreement of interest rates, treatment of back interest, Connecticut Mutual to write to the Authority declaring all bonds due and payable

4—Meeting with representatives of White, Weld & Co., Robinson Humphrey & Co., Alester Furman & Co., B. J. Van Ingen & Co., Inc., J. R. Williston & Beane (formally Clement Evans & Co.), to explain details of refunding plan, ask for cooperation

5—Appointment of Citizens & Southern National Bank, Columbia, S. C. as escrow and exchange agent

6—Print exchange agreements and prospectus, give history, projections of revenues and customers

7—Solicit deposits through all sources, dealers, paying agent, banks, etc.

8—Upon deposit of $3,278,000 or more bonds, effect exchange and pay for $500,000 Refunding and Improvement bonds and up to $500,000 Refunding bonds

*Economic Reasons for Exchange*

1—The combination interest rates of 4-4½% for the Refunding bonds and 5¼% for the Refunding and Improvement Bonds show:

(A)

| Year | Projection | Maximum Interest | Coverage |
|---|---|---|---|
| 1 | $205,454 | $200,010 | 1.03 X |
| 2 | $227,548 | $200,010 | 1.14 X |
| 3 | $257,791 | $200,010 | 1.29 X |

(B) Based on the Flow of Funds previously outlined including the payment of back interest, all of the bonds will be retired in 1986 and the back interest will be paid in full by 1989

(C) The proceeds of the $500,000 Refunding and Improvement Bonds is estimated will provide sufficient funds to pay the expenses for the refunding and finance the 3 year improvement program now contemplated by the Authority

(D) Upon completion of the exchange, we believe that after one year of operation the credit of the Authority will be reestablished, thus enabling it to negotiate authoritatively with large potential gas customers

(E) It should place the Authority in a strong position to negotiate with Carolina Pipe Line Company relative to the sale of gas to Rock Hill Finishing Company and the Celanese Corporation

*Copy of Bond Amortization Table attached:*

1—Based on full amount, $1,000,000 of Refunding and Improvement bonds to be issued

2—Based on projection of increased revenues with present capital expenditures for ten years

No consideration is given to the higher expenditure of the proceeds from the new 5¼% Refunding and Improvement Bonds.

Respectfully submitted,
WATKINS, MORROW & CO.
HERBERT J. SIMS & CO., INC."

In effect this plan sets up the proposed outline of machinery for accomplishing the borrowing the Authority Resolution of April 1964 details.

It is undisputed that the allegation of the petition as to its financial difficulty are true, VIZ:

"3. That Petitioner encountered a number of unforeseen difficulties in creating and establishing its gas system, including particularly (a) unavoidable delay in financing with resultant loss of one year's anticipated heating season revenues, (b) unanticipated additional construction costs, and (c) exhaustion of maximum allowable capitalized interest funds before generation of sufficient earnings to meet interest cost out of current revenues available after payment of operating costs: and that as a result thereof Petitioner is in default under the terms of its Bond Resolution and Supplements and the requisite number of bondholders have declared all Outstanding Bonds forthwith due and payable pursuant to the requirements of said Resolution and Supplements."

"4. That the revenues pledges for payment of the Outstanding Bonds described above are inadequate to pay said Bonds and the interest thereon as the same mature, after first providing for necessary operating costs; that because of its default Petitioner is unable to obtain necessary funds with which to meet an ever increasing present demand for gas service, particularly in newly established outlying residential developments seeking gas service for central heating, hot water heating and cooking requirements; and that a long period of restricted growth and continued default, with serious limitation upon its ability to properly serve the public and to meet its obligations to its bondholders, will ensue * * *.

Upon affidavit that 85% of the affected creditor bondholders had approved the petition, the Court ordered [9] same filed and fixed a hearing date as provided in 11 U.S.C.A. § 403, sub. b,[10] setting time

9. The Order is reported as appendix III to this Order.

10. Section 403, sub. b, in the first paragraph, provides:

"Upon approving the petition as properly filed, or at any time thereafter, the judge shall enter an order fixing a time and place for a hearing on the petition, which shall be held within ninety days from the date of said order, and shall provide in the order that notice shall be given to creditors of the filing of the petition and its approval as being properly filed, and of the time and place for the hearing. The judge shall prescribe the form of the notice, which shall specify the manner in which claims and interest of creditors shall be filed or evidenced, on or before the date fixed for the hearing. The notice shall be published at least once a week for three successive weeks in at least one newspaper of general circulation published within the jurisdiction of the court, and in such other paper or papers having a general circulation among bond dealers and bondholders as may be designated by the court, and the judge may require that it may be published in such other publication as he may deem proper. The judge shall require that a copy of the notice be mailed, postage prepaid, to each creditor of the petitioner named in the petition at the address of such creditor given in the petition, or, if no address is given in the petition for any creditor and the address of such creditor cannot with reasonable diligence be ascertained, then a copy of the notice shall be mailed, postage prepaid, to such creditor addressed to him as the judge may prescribe. All expense of giving notice as herein provided shall be paid by the petitioner. The notice shall be first published, and the mailing of copies thereof shall be completed, at least sixty days before the date fixed for the hearing."

at 10:30 A.M. October 30, 1964 at Greenville, S. C. Protestant J. P. Mozingo thereafter filed his petition of protest alleging:

"(t)hat he is the owner of certain Bonds, that he received no prior notice of this proceeding although a known bondholder-creditor, that he is dissatisfied with the proposed Plan of Composition, and that he proposes an alternate plan suggested by others (not specified as creditors or bondholders) which he avers is better designed for protecting Petitioner and/or other bondholders. He cited the potential he subscribes allegiance to as Carolina Pipeline Company, not therefore identified with the Plan of Composition as creditor, or approved source of relief, or a party of interest to the proposed plan, pleading the same as the source of guarantee of his security, his solvency as creditor, insofar as his investment is concerned."

On October 21, 1964, ratifying previous verbal assurance by this court, on order decreed: "James P. Mozingo, III, will be accorded all rights granted by statute to any objecting bondholder * * *." The Court further provided: (Protestant) "must have his day in court." This he has had, and the hearing has been recessed and reconvened from time to time to accomplish full exploration.

The Court must first face the issue of "who", or "what" is authorized by the National Statute. Section 401 of Title 11 (Chapter 9) provides:

"This title and proceedings thereunder are found and declared to be within the subject of bankruptcies and, in addition to the jurisdiction otherwise exercised, courts of bankruptcy shall exercise original juris-

diction as provided in this chapter for the composition of indebtednesses of * * * (6) incorporated authorities, commissions, or similar public agencies organized for the purpose of constructing, maintaining, and operating revenue-producing enterprises."

Section 402 of Title 11 defines confines:

"The term 'petitioner' shall include any agency or instrumentality referred to in section 401 of this title."

■■ In the light of this statutory guidance the court examines the statute or status of protestant Mozingo, and Carolina Pipeline. Petitioner is included in the limits of as to a "public" agency, and the statute so limits. The legal test between a private or public authority or agency is whether the authority or agency is subject to control by public authority, state or municipal.[11] The South Carolina Court, in distinguishing the term "public" from "private" noted in State ex rel. Railroad Co. v. Whitesides, 30 S.C. 579, 9 S.E. 661, 663:

"What is the meaning of the term 'public'? This term is opposed to the term private, and, according to the best lexicographers, means 'pertaining to, or belonging to, the people; relating to a nation, state, or community.'"

Petitioner meets the test of the statute. Protestant Mozingo, sponsoring a plan of composition which was, and is, effectually, Carolina Pipeline Company's hope to gain control of the Petitioner, does not meet the test. Nor do Carolina Pipeline Company, and Thornton, Farish & Gauntt, Inc. its proposed investment bankers in this controversy meet the test. They are classified as "pri-

11. See Kerr v. Enoch Pratt Free Library of Baltimore, D.C., 54 F.Supp. 514, which defines, using the word "public or private corporation", but applicable to "authority" or "agency". Quoting "to make the corporation a public one, its managers, whether trustees or directors, must not only be appointed by public authority but subject to its control." Petitioner meets the test. See also Norris v. Mayor and City Council of Baltimore, 78 F.Supp. 451.

vate", without the permission of Section 401 of Title 11.[12]

The fact that Protestant Mozingo cannot present a plan as petitioner

12. Protestant's exhibit 7 is a proposed "Underwriting Agreement York County Natural Gas Authority" obviously prepared by Thornton, Farish & Gauntt, Inc., a part of the cover letter to Senator Mozingo reading:

"This will confirm our various conversations over the past several weeks with regard to your plan of submitting to the Court an implementation to the 'Plan of Composition' filed by York County Natural Gas Authority in the United States District Court No. B2075 (hereinafter referred to as "Plan").

As we understand your proposal, you, as a minority bondholder, together with other holders of York County Natural Gas Revenue Bonds, do not feel that the holders of present bonds will be fully protected under the Plan as now submitted to the Court and you have obtained from Carolina Pipeline Company (hereinafter "Carolina") an agreement to lease the properties of the Authority on a long term lease arrangement (hereinafter "Lease") which among other terms and conditions provides that Carolina pay as annual rental direct to a Trustee Bank (hereinafter "Trustee") a sum of money sufficient to pay promptly when due, all principal and interest requirements of presently outstanding $3,-778,000 Bonds which are to be exchanged and $850,000 of new Bonds to be issued for the purpose of paying to all holders in cash and/or parity bonds, all past due interest accrued to them since September 1, 1961, all as more fully detailed in the attached letter from Carolina to you, dated October 8, 1964, marked Exhibit #1, which by reference hereto is made a part hereof.

You have requested us, as investment banker, to submit to you a firm purchase agreement which may be submitted to the Court as a part of your plan, in order that the Court and the bondholders may examine the relative merits of each and a determination be made as to which more fully protects the inherent rights of the bondholders.

The undersigned officer of this firm is a Director of Carolina and in order to fully avoid any possible ethical or conflict of interest, we wish to submit our commitment to you in the following manner:

A. The cash requirements needed to pay past due interest, assuming no holder would elect to take bonds for interest, would be $850,354 as of September 1, 1964.

B. For $850,000 Series B parity bonds, bearing interest at 4% for three years and 4¾% thereafter, all as more fully described in Exhibits #1 and #2 attached hereto, or the amount finally determined to be necessary, but for not more than $850,000 of such bonds, said bonds to be additionally secured by the Lease Rentals from Carolina, copy of such Lease being attached hereto and made a part hereof, we will pay 100% of par value plus accrued interest to date of delivery, subject only to the following conditions:

1. The bonds are to be delivered to the undersigned within 75 days from date hereof (unless extended by mutual consent) together with an unqualified legal opinion of nationally recognized Bond Counsel satisfactory to the undersigned.

2. The Lease to be substantially as attached hereto, with any changes therein having the complete approval and consent of the undersigned.

3. The Bond Resolution to be substantially as that previously submitted to the Court, with all references and rights to issue Prior Lien Bonds deleted therefrom. All changes must have the approval and consent of the undersigned.

4. All expenses pertaining to the issuance of and the exchange of the bonds, printing costs, fees and expenses of local attorneys and bond counsel and Court costs are to be paid by the Authority as outlined in Paragraph 4 of Exhibit #1 attached, or as the Court may direct. All expenses pertaining to issuance and exchange are to be paid by others and not by the undersigned.

5. The fees, charges and expenses of the underwriters who have been responsible for the Plan of Composition as now filed with the Court, is not to be changed nor decreased in any manner whatsoever; and further that such underwriters be given an opportunity to purchase the bonds under the same terms and conditions enumerated herein, and if purchased by them cancels this commitment without prejudice.

C. While this constitutes our firm commitment to you for submission to Court, in order to expedite re-

does not in any way prevent his acting as creditor, per se, through counsel, or associate counsel, and with advisers, as he was and is permitted to do. In the hearings at Greenville and Rock Hill he was accompanied by various persons, specialists and otherwise. The court takes judicial notice of the fact that any plan of composition would "affect his interest materially," and of the provisions of the Chapter which provide:[13]

"The 'plan of composition', within the meaning of this chapter, may include provisions modifying or altering the rights of creditors generally, or any class of them, secured or unsecured, either through issuance of new securities of any character, or otherwise, and may contain *such other provisions and agreements not inconsistent with this chapter as the parties may desire.*" (Emphasis added)

Before concluding the hearing in the matter, this Court reviewed the transcribed testimony, contracts, proposals, acceptances, deposit agreements, and all other papers relating to the plan and presented to the Court[14] by Petitioner and/or protestant. Additionally, a hearing was held in the Rock Hill Division of the United States District Courts for the Western District of South Carolina, on January 23, 1965 to determine a meth-od of transferring the bonds, pendente lite, without creating confusion because of the surrender to the transfer agent, or fiscal agent. A copy of that order is attached hereto as Appendix IV hereof.

The Court now turns to the interlocutory order of approval or disapproval of Petitioner's plan and any modification thereof in the light of issues raised.[15]

At the time the original order approving the filing of the Petition for Composition the Court made a prima facie finding, upon proper and verified showing, that some 85% of the affected creditors, representing substantially more than the required percentage of (51%) required by statute, had approved the Plan of Composition in writing. This approval was accomplished by the surrender of the bearer bonds, accompanied by a consent, as described in appendix II hereof, to the fiscal agent, Citizens & Southern National Bank, Columbia, S. C. At the date of the initial hearing in Greenville this had increased to more than 90%. Protestants presented requests for withdrawal[16] which, if allowed, would have reduced this figure to 85.2% at that hearing and 74.4% at conclusion of the hearing. Thus the necessary jurisdictional fact of the 51% was clearly established, and is no longer at issue.

lief of the existing Bondholders, we respectfuly suggest that you consider also the following:

1. The above commitment as outlined will be honored and our good faith certified check of $17,000 will be deposited with the Court if approved by the Court, Bondholders and Authority; or

2. To avoid any adverse criticism, we guarantee to submit the identical bid under the same terms and conditions outlined above if the bonds are advertised and put up for public sale, with the bonds being awarded to the highest and best bidder.

Nothing contained herein is to be construed as an attempt to negate the existing underwriter's contract with the Authority, which we insist must be honored, but merely is an attempt to im-plement the plan as filed, which in the final analysis will, in our opinion, materially benefit the existing bondholders.

Trusting that this is satisfactory from your standpoint and assuring you of our desire to be helpful in this instance, we remain

Very truly yours,
/s/ W. L. Gauntt
THORNTON, FARISH & GAUNTT, INC."

13. Title 11 U.S.C.A. § 403, sub. a.

14. As directed in Title 11, U.S.C.A. § 403, sub. e.

15. See 14.

16. Protestant represented at the hearings approximately 25% of those outstanding bonds, whose holders had requested withdrawal of consents formerly filed with the fiscal agent.

■ The Court, however, continues to act in reliance thereon and upon additional consents initially given, and such consents may not be withdrawn or changed except by leave of this Court on proper cause. The applicable statutory provisions establish procedure for withdrawal of consent only in the event of change or modification of the Plan of Composition submitted by Petitioner, which has not occurred. The statutory establishment of specific withdrawal procedure under specific conditions negatives the existence of withdrawal procedure by any other means or under any other conditions.

■ This proposition is supported by the well recognized maxim:

"Expressio unius est exclusio alterius."

It is also supported by the holding of the United States Supreme Court in the case of Raleigh & G. R. Co. v. Reid, 13 Wall. 269, 80 U.S. 269, 20 L.Ed. 570, wherein the Court said:

"When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode."

■ Aside from the statutory limitation on withdrawals there exists the further limitation imposed by the fact that when the Petitioner and 51% or more of its creditors join together in asking the Court to consider and approve the Plan of Composition, and in this case 85% of the creditors had so joined at the time of filing of the Petition, there is created thereby an obligation in the nature of a contract or agreement. Having become properly bound thereby, a creditor may not be relieved of this obligation at his own whim, and any such relief must be for cause and with the assent of the Court.

In Wells Fargo Bank & Union Trust Co. v. Imperial Irr. Dist., C.C.A.Cal. 1943, 136 F.2d 539, 54 Am.Bankr.Rep. N.S. 58, certiorari denied 321 U.S. 787, 64 S.Ct. 784, 88 L.Ed. 1078, rehearing denied 322 U.S. 767, 64 S.Ct. 940, 88 L.Ed. 1593, the Circuit Court of Appeals said:

"The plan of composition is one agreed upon by the District and a majority of the creditors affected and that the function of the court is to determine whether or not the agreement made complies with the statutory requirements."

■ Finally on this point it was indicated to affected creditors in Respondent's letter to Bondholders, which was not authorized by the Court as initially sought [17] by Respondent, that such Bondholders had a choice or election as between the plan proposed by Petitioner and the allegedly faster paying "Plan" tendered by Respondent. This undoubtedly caused some creditors to take the view that rather than choose between two opposing plans, they would become neutral and await action by the Court before deciding which plan to sponsor. The fact that so many of the limited number of creditors seeking withdrawal of former consents did not at the same time assent to the Mozingo-Carolina proposal is strong evidence of this. The alternate proposal has undoubtedly been misleading to the creditors as it never reached the level of being a plan available for acceptance by creditors, because (1) Petitioner had not assented, (2) Petitioner did not have the legal ability to carry out and fulfill the alternate proposal, and (3) 51% of the affected creditors did not assent to the alternate proposal. On this account it was disallowed by the Court as a plan in its own right.

■ Respondent has sought disallowance of a number of the consents on grounds of lack of authority or control by Petitioner. The applicable statute provides that "any creditor may act in person or by an attorney or a duly authorized agent or committee." (Sec. 403, sub. a) Delivery of bearer bonds for exchange along with the consent of the holder is ample evidence of authority. The matter of consents is not regulated

17. But which the Court now finds to have been proper and correct under the circumstances.

by the requirements applicable to creditor groups acting generally through an agent or committee. The control of claims by Petitioner which is disallowed by the Statute (Sec. 403, sub. d) is of that character calculated to taint the result with fraud and destroy the elements of fairness and equity in the plan. The Respondent has failed to establish the right to disallowance of any consents on this basis. However, if there were any disallowances it would reduce both claims and consents, with small effect on net remaining consents as the exclusion of "*claims* controlled by Petitioner" is what is required by the Statute.

■ Where the Plan of Composition under consideration by the Court has been submitted by a qualified Petitioner, acting in good faith and where the consent in writing of two-thirds of the affected creditors exists, the Court then has the legal duty of determining whether the plan is fair and reasonable and non-discriminatory and whether all costs and expenses are reasonable and proper in all regards, and upon so finding it should approve the plan. See In re Willacy County Water Control and Improvement District No. 1, D.C.Tex.1940, 36 F.Supp. 36. McDonald v. Banta Carbona Irr. Dist. C.C.A.Cal.1941, 123 F.2d 968, 47 Am.Bankr.Rep.N.S. 784. Certiorari denied 62 S.Ct., 1034, 316 U.S. 668, 86 L.Ed. 1743.

■ This protestant complains that he was not given personal notice by mail though he alleges that his status as a bondholder was well known to Petitioner. He admits in his Answer that "first notice of this proceeding was received by your Respondent by way of newspaper publicity after the filing of this action." Respondent is undoubtedly referring to published reports of the filing of the Petition and the granting of Preliminary Order on August 25, 1964, which was carried in the Columbia, S. C., State and other papers on or about August 26, 1964, as shown by the record herein. This was in addition to formal publication of the Notice. From this and other evidence in the record, it is apparent that this protestant has had as much time in which to act responsively to the Petition and Order as any other Bondholder. He has failed to offer evidence of any definite or positive prejudice to his rights. He had not taken advantage of the right to register his bonds, which would have assured him the right to personal notice. The statute clearly contemplated that Notice given by publication is to apply to those not given Notice by mail. Protestant did not appear specially to question jurisdiction of this Court over him and his rights in this matter, but filed general Answer responsive to and controverting certain of the allegations of the Petition. He is properly before the Court and subject to its jurisdiction in all regards. His motion to dismiss or postpone the proceedings due to inadequacy of notice must be denied. The rights of Petitioner and of a large majority of its Bondholders could be seriously prejudiced by any failure of this Court to handle this matter with proper dispatch, subject of course to allowing protestant his day in Court, which has been duly and properly given him.

Due notice of hearing was given as required by the Order of this Court dated August 25, 1964, by mailing of notice on August 28, 1964 to all known bondholders listed or referred to in the Petition of August 25, 1964, and by publication of notice once a week for three weeks in the State, at Columbia, S. C., and the Daily Bond Buyer, at New York, N. Y., commencing August 28, 1964. Affidavits on file in the record and testimony offered at the hearing commenced on October 30, 1964 at the Federal Courthouse in Greenville, S. C., pursuant to such notice, and thereafter continued on November 7, 1964 at the Federal Courthouse in Rock Hill, S. C., amply demonstrate proper compliance with the requirements of law as to the giving of notice. No affected creditor has filed Answer opposing approval of the plan, except James P. Mozingo, III, of Darlington, S. C., the holder of 71 Bonds. Though he stated in his Answer that he was appearing only in his own behalf, he announced at the hear-

ing that he represented a number of persons whom he named in the record, holding according to his calculations some 400 bonds, or about 10% of the total bonds outstanding.

Protestant complains of certain departures from the law, covenants and agreements, of the Authority, by its personnel and management. While this court allowed full explanation and cross-examination, there is neither plan nor permission in Chapter 9 of the Bankruptcy Act for the determination of this issue in a debt composition proceeding. Its bearing on the question of approval of the plan has been fully considered by this Authority in accordance with the Court's duties and responsibilities as detailed in 11 U.S.C.A. § 403.

Other complaints by protestant fail to raise proper issues here, ignore the evidence in the record. Significant was a statement in protestant's brief that "Respondent filed a timely answer to the petition and despite inadequate preparation time is before the court by right, not by grace." Protestant, according to Carolina's investment bankers [18] had the matter under advisement, and was being advised long in advance of the initial hearing which was recessed to give full time for cross-examination and presentation.

Protestant seeks to have this court implant, as to certain holding of the fiscal agent and others, an interpretation that their action was not in "good faith". Cited to the court is American United Mutual Life Ins. Co. v. Avon Park, 311 U.S. 138, 61 S.Ct. 157, 87 L.Ed. 91, 136 A.L.R. 860. In that case the stated charge for handling by the fiscal agent was much less *if the bondholder should sell to the fiscal agent accrued interest coupons at a third of their face value.* No analogous or similar practice exists in the record before this Court. The record discloses no practice in fact, or in contemplation, not in "good faith". Uncontroverted is the fact that those accused by protestant will be affected *exactly* as protestant insofar as surrender of present and issuance of new bonds are concerned. Certain fees, necessary and usual, will accrue, and these are treated hereinafter. This Court finds no failure of disclosure in connection therewith.

Protestant complains that, under the reasoning of Fano v. Newport Heights Irrigation District, et al. the plan of composition should be denied because Petitioner did not raise the gas rates. This court was impressed with the testimony that the Authority could not compete, could not keep its customers, if the rates were raised. Carolina Pipeline Company, ever in the shadows, appearing [19] openly at Rock Hill, did not offer any solution for attraction of new customers or retention of old under Carolina Pipeline rates or control of the Authority. This Court takes judicial notice of the effort of South Carolina public official and private business to attract new industry and the place of authorities such as Petitioner in the industry hunting spectrum. Not material to this issue was the inevitable question raised in the court's thinking of the chanelling of future new business—would it be tied in with, or sent to, Carolina, if Carolina had control of the authority, or to the Authority. Might not the position of the bondholders become precarious because of loss of business under higher rates, inability to expand under the higher rates, the new control? Therefore the case of Fano v. Newport Heights Irr. Dist., 9 Cir., 114 F.2d 563, cannot be relied on for guidance here; the facts, the climate of operation by the Authority, the fact of competition, are different. This court is mindful, too, that the reasoning of the court in Fano, supra, was predicated: "In view of the *small amount* of deficiency in tax payments * * *"; there is no factual analogy to the deficiency here.

18. See Note 12, supra.

19. Pipeline President Warren and Attorney Knowlton testified at the hearing in Rock Hill, S.C.

 Other than a modification of the Plan of Composition insofar as the fees, etc. to be paid are to be reduced, this court finds:

(1) It is fair, equitable, and for the best interests of the creditors and does not discriminate unfairly in favor of any creditor or class of creditors;

(2) Complies with the provisions of this chapter;

(3) Has been accepted and approved as required by the provisions of subdivision (d) of this section;

(4) All amounts to be paid by the petitioner for services or expenses incident to the composition have been fully disclosed and are reasonable;

(5) The offer of the plan and its acceptance are in good faith; and

(6) The petitioner is authorized by law to take all action necessary to be taken by it to carry out the plan.

Paragraph 6 of the original Petition reads as follows:

"6. That allowances for refunding and improvement costs, as fixed without reference to necessity for this legal proceeding, which are hereby averred to be reasonable and necessary and which are payable solely by Petitioner without payment of any cost by any creditor or other person or agency, have been fixed and agreed upon, as follows:

| | |
|---|---|
| Extensions and Improvements (3 years) | $380,000 |
| Fee to Investment Bankers | |
| 2½% on $3,778,000 Refunding Bonds | 94,450 |
| 2½% on $522,000 Improvement Bonds | 13,050 |
| Legal costs and expenses, including | |
| bond counsel | 25,000 |
| Exchange Agent | 10,000 |
| Printing new bonds | 2,000 |
| Administrative and miscellaneous costs | 2,500 |
| Total | $527,000" |

The Court finds these costs and fees need adjustment and approves:

| | |
|---|---|
| Extensions and Improvements (3 years) | $380,000 |
| Fee to Investment Bankers | |
| 1½% on $3,778,000 Refunding Bonds | 56,670 |
| 1½% on $522,000 Improvement Bonds | 7,830 |
| Legal costs and expenses, including bond counsel | 17,500 |
| Exchange Agent | 7,500 |
| Printing new bonds | 2,000 |
| Administrative and miscellaneous costs | 2,000 |
| Total | $473,500 |

Counsel for Petitioner have, to the knowledge of the court, performed other services, and the adjustment hereinabove does not include proper fees therefor, which this court will pass on at a later date.

The Plan of Composition is hereby approved as of this date, subject to the taking of proper action by Petitioner as hereinafter required.

Petitioner is hereby authorized and directed to forthwith proceed with imple-

mentation and carrying out of the Plan of Composition approved by this Order through immediate adoption of the Supplemental Resolution and immediate deposit with the fiscal agent for delivery pursuant to and subject to the requirements of the Resolution and Supplement Resolution of the Bonds of Series A and B and any interest now due thereon, together with the necessary Certificates of Indebtedness; whereupon the fiscal agent shall forthwith proceed with implementation of the plan of exchange and delivery defined in the Resolutions, all of which shall be accomplished within not exceeding 15 days after this Order shall become finally binding and effective.

Upon implementation of the Plan of Composition approved hereby through deposit by Petitioner with Citizens and Southern National Bank of South Carolina, at Columbia, S. C., as fiscal agent and as exchange agent, of all required Refunding and Improvement Bonds of Series A and B, all interest due thereon and all Certificates of Indebtedness necessary to provide for delivery of all Bonds of Series B and exchange of all Bonds of Series A in accordance with the Plan of Composition for all Outstanding Bonds and Coupons, whether deposited or not, and upon implementation of the plan of delivery and exchange, except as to bonds not yet deposited, then and thereupon the Outstanding Bonds shall be fully extinguished and shall no longer constitute an indebtedness due by Petitioner or any impediment to full validity of the Refunding and Improvement Bonds now being issued; provided that any still undeposited Outstanding Bonds and Coupons shall nevertheless be and continue acceptable for purposes of refunding exchange only, during the additional time allowed therefor under the provisions of paragraph (6) of this Order.

Bondholders who have not yet deposited their Outstanding Bonds and Coupons for refunding exchange shall be allowed until two years following the effective and binding date of final decree of approval of the Plan of Composition

pursuant to subparagraph f of Section 403, Title 11, U.S.Code, or until the March 1, 1967 regular interest payment date, whichever shall last occur, within which to deposit such Outstanding Bonds and Coupons with the Citizens and Southern National Bank of South Carolina, at Columbia, S. C., as fiscal agent and as exchange agent for refunding exchange pursuant to the approved Plan of Composition, provided that after such latter date all liability of Petitioner under any undeposited Outstanding Bonds and/or Coupons and under any undelivered refunding Bonds and/or Certificates of Indebtedness deposited with the fiscal agent for purposes of refunding exchange shall stand fully extinguished because of the nondeposit of such Outstanding Bonds and Coupons within the time allowed by this Court; and that any such extinguished Refunding Bonds and/or Certificates of Indebtedness held by the Fiscal Agent shall be voided and delivered to Petitioner, all consistently with provisions to this effect contained in the Notice of Hearing pursuant to the initial Order herein.

That the payments outlined hereinabove are approved, subject to modification or change on proper showing.

This Court retains continuing jurisdiction of this proceeding and of all persons subject to the jurisdiction of the Court herein pending and until all Outstanding Bonds have been exchanged or all rights under any Outstanding Bonds have been fully and finally extinguished for all purposes, including validity solely for exchange for Refunding Bonds and Certificates of Indebtedness. Any person having proper interest may Petition this Court at any time on reasonable notice for any necessary and proper relief incident to implementation and carrying out of the Plan of Composition approved hereby; provided, however, that this provision of this Order shall not be construed to include the resurrection and restoration of any rights already finally extinguished by the provisions of this Order.

A final decree shall be issued herein following implementation of the Plan of Composition approved hereby.

And it is so ordered.

## APPENDIX III

## PETITION FOR APPROVAL OF PLAN OF COMPOSITION

TO THE HONORABLE COURT AFORESAID:

Now comes the Petitioner, York County Natural Gas Authority, by and through its undersigned counsel, and respectfully shows:

1. That Petitioner is a body politic charged with providing natural gas service to the general public of York County, South Carolina, having been created by Legislative Act No. 959 of the Acts of South Carolina for 1954; and that Petitioner is an agency or instrumentality of the type and character defined and described in Title 11, Section 401, United States Code.

2. That pursuant to due legal authority Petitioner has now outstanding Revenue Bonds and interest thereon payable solely from the revenues of its natural gas system, heretofore issued to finance construction, completion and extension of said system, as follows:

(a) $2,762,000 of Natural Gas System Revenue Bonds, dated September 1, 1957, bearing interest at six separate rates, and varying from 5% to 5.80%, which has not been paid since the interest payment date of March 1, 1961, and is due from such date at the respective rates borne by such bonds.

(b) $450,000 of Natural Gas System Revenue Bonds, dated September 1, 1958, bearing interest at six separate rates, and varying from 5% to 5.80%, which has not been paid since the interest payment date of March 1, 1961, and is due from such date at the respective rates borne by such bonds.

(c) $422,000 of Natural Gas System Revenue Bonds, dated July 1, 1959, bearing interest at six separate rates, and varying from 5% to 5.80%, which has

not been paid since the interest payment date of March 1, 1961, and is due from such date at the respective rates borne by such bonds.

(d) $144,000 of Natural Gas System Revenue Bonds, dated October 1, 1960, bearing interest at 6%, which has not been paid since the interest payment date of September 1, 1962, and is due from such date at the rate borne by such bonds.

(e) $95,758 for moneys advanced to Petitioner by certain of those who purchased the Outstanding Bonds, used by Petitioner along with its own moneys available therefor to meet the March 1, 1961 coupons on the Outstanding Bonds described in subparagraphs (a), (b) and (c) above.

3. That Petitioner encountered a number of unforeseen difficulties in creating and establishing its gas system, including particularly (a) unavoidable delay in financing with resultant loss of one year's anticipated heating season revenues, (b) unanticipated additional construction costs, and (c) exhaustion of maximum allowable capitalized interest funds before generation of sufficient earnings to meet interest cost out of current revenues available after payment of operating costs; and that as a result thereof Petitioner is in default under the terms of its Bond Resolution and Supplements and the requisite number of bondholders have declared all Outstanding Bonds forthwith due and payable pursuant to the requirements of said Resolution and Supplements.

4. That the revenues pledged for payment of the Outstanding Bonds described above are inadequate to pay said Bonds and the interest thereon as the same mature, after first providing for necessary operating costs; that because of its default Petitioner is unable to obtain necessary funds with which to meet an ever increasing present demand for gas service, particularly in newly established outlying residential developments seeking gas service for central heating, hot water heating and cooking requirements; and that a long period of restricted growth

and continued default, with serious limitation upon its ability to properly serve the public and to meet its obligations to its bondholders, will ensue unless Petitioner obtains approval for composition with its creditors as hereinafter outlined and sought.

5. That according to realistic revenue projections based upon past actual operating experience, with allowance for reasonable future growth as estimated therefrom, your Petitioner has now developed sufficient revenue producing potential (a) to meet current interest cost at a realistic current interest rate on the Refunding and Improvement Bonds proposed to be issued to cover the costs and expenses of the refunding and improvement program; (b) to retire the refunding and improvement bonds within a 30 year period; and (c) to provide for eventual payment of all interest now outstanding and unpaid, without interest thereon, within approximately the same retirement period.

6. That allowances for refunding and improvement costs, as fixed without reference to necessity for this legal proceeding, which are hereby averred to be reasonable and necessary and which are payable solely by Petitioner without payment of any cost by any creditor or other person or agency, have been heretofore fixed and agreed upon, as follows:

| | |
|---|---:|
| Extensions and Improvements (3 years) | $380,000 |
| Fee to Investment Bankers | |
| 2½% on $3,778,000 Refunding Bonds | 94,450 |
| 2½% on $522,000 Improvement Bonds | 13,050 |
| Legal costs and expenses, including bond counsel | 25,000 |
| Exchange Agent | 10,000 |
| Printing new bonds | 2,000 |
| Administrative and miscellaneous costs | 2,500 |
| Total | $527,000 |

7. That detailed plans for issuance of Refunding and Improvement Bonds as herein contemplated, which fully reflect the terms and conditions of the Plan of Composition presented and filed by way of this Petition, are fully set forth in a Bond Resolution duly adopted by Petitioner on April 16, 1964, the full content of which is hereby incorporated herein by reference, it being particularly noted in this connection that due authorization for the refunding of its Outstanding Bonds has been granted to Petitioner by Legislative Act of the South Carolina General Assembly of 1964, as reported in the Bond Resolution aforesaid; that a copy of said Bond Resolution, duly certified by the Secretary of Petitioner under its official seal, is being filed along with this Petition as Exhibit "A" thereto; that provision is made for adoption of a Supplemental Resolution fixing the exact number of Series A and Series B Bonds to be issued within the combined total of $4,300,000, after such exact number is finally fixed, which it now appears will be $3,778,000 of Series A Bonds and $522,000 of Series B Bonds, if such amounts be approved by this Court; and that the exact title of the Refunding Bond Resolution, as prepared by Sinkler, Gibbs & Simons, Bond Counsel, and adopted by Petitioner, is as follows:

"A Resolution Providing for the Issuance and Sale of Four Million Three Hundred Thousand ($4,300,-000) Dollars York County Natural Gas Authority Refunding and Improvement Revenue Bonds, Dated March 1st, 1964."

8. That by their voluntary action approximately 85% of the holders of Outstanding Bonds issued by your Petitioner have deposited their Bonds with Citizens and Southern National Bank of

South Carolina, at Columbia, S. C., as Fiscal Agent and as Exchange Agent for Petitioner, and have consented in writing upon a form entitled Letter of Transmittal, responsive to a form describing the Plan of Composition entitled Memorandum, to proceeding with said Plan of Composition and with refunding of the Outstanding Bonds as proposed in the refunding Bond Resolution identified above; that the form and general content of the Letter of Transmittal and of the Memorandum, copies of which are filed with this Petition as Exhibits "B" and "C" thereto, respectively, are incorporated herein and made a part hereof by reference; and that a list of all bondholders who have filed such consents with the Fiscal Agent, duly certified by the Fiscal Agent and showing the names, addresses and securities deposited by each, copy of which is filed with this Petition as Exhibit "D" thereto, is incorporated herein and made a part hereof by reference.

9. That except in cases where same may have been duly registered in the name of a specific owner, all Outstanding Bonds of Petitioner are payable to bearer; that due to widely held ownership of bearer bonds, it has been impossible for Petitioner to establish and determine ownership of Outstanding Bonds not yet deposited with the Fiscal Agent, except in a limited number of situations, and even in such cases the ownership of any bearer bonds can change at any time without knowledge of Petitioner or its Fiscal Agent; that in consequence of the matters and things aforesaid, Petitioner hereby avers, on information and belief, that all Outstanding Bonds not yet deposited with its Fiscal Agent for refunding exchange, whether registered or payable to bearer, as to which any knowledge concerning ownership is available to Petitioner after due diligence, are now held by the persons or agencies having the addresses and believed to hold such amounts of Outstanding Bonds or Coupons as respectively appear on an authenticated list thereof prepared by the Fiscal Agent from best obtainable information, copy of which is filed with this Petition as Exhibit "E" thereto, which list is hereby incorporated herein and made a part hereof by reference.

10. That Petitioner hereby seeks approval by this Court of the Plan of Composition fully described in this Petition pursuant to and in accordance with the provisions of Title 11, Section 401 et seq. United States Code, and in this connection Petitioner hereby avers that the approvals already in hand, approximating 85%, are more than adequate to fulfill the requirements of law for such approval, subject to giving of proper notice and holding of the requisite hearing.

11. That approximately 600 Bonds of $1,000 denomination representing approximately 15% of the Outstanding Bonds remain undeposited; that the Resolution and Supplements under which the Outstanding Bonds were issued contain a covenant and limitation in Section 8.05 of the Resolution against the issuance of any further Bonds, except under an earnings formula which cannot be met, in language substantially as follows:

"No Bonds or other obligations of the Authority of any sort payable from the revenues of the System shall be issued except those provided for by the provisions of this Article, and herein denoted as Additional Bonds."

12. That the only assured means of discharging the undeposited Outstanding Bonds without intervention of this Court would be by depositing the full amount of principal and interest due thereon with the Fiscal Agent; but that to follow this course would subject Petitioner to substantial additional costs which would destroy feasibility of the Plan of Composition, and would in addition impose an inequitable penalty on the bondholders who have deposited their bonds for exchange, by providing for cash payment of full principal and all accrued interest on the undeposited Outstanding Bonds; that on information and belief, a large majority of the still undeposited bonds are not being withheld from deposit be-

cause of objection to the Plan of Composition, but on account of lack of attention or lack of information on the part of the unknown holders thereof; and that under all existing circumstances the most equitable arrangement possible is for the Court to approve the Plan of Composition and provide for its implementation as hereinafter prayed.

13. That approval of the Plan of Composition will effect substantial savings in interest cost to Petitioner over a period in excess of 20 years; that upon such approval it would be right and proper that all costs of this action be taxed against and paid by Petitioner herein, including the $100.00 filing fee paid herewith and including a reasonable fee as fixed by the Court for legal services rendered by counsel for Petitioner in the handling of this proceeding, which shall be in addition to compensation for other services in connection with the Composition.

14. That all holders of Outstanding Bonds or Coupons are of the same class, protected by pledge of the same revenues; that except for the Outstanding Bonds herein mentioned, all or substantially all other obligations of Petitioner are current and not in default; and that no action is now pending in any Court for legal enforcement against Petitioner of any unpaid indebtedness.

WHEREFORE, Petitioner respectfully prays for an Order of this Court providing and/or directing, as follows:

(a) That the foregoing Petition be approved as properly filed pursuant to the requirements of law and in good faith.

(b) That it appears prima facie, and subject to final hearing, that substantially more than the required amount of creditors have approved the Plan of Composition in writing, that the Plan is fair and equitable and should be approved and that any failure to approve same could create serious inequity between creditors of the same class.

(c) That a hearing on the Petition be fixed at a time and place convenient to the Court and within the time limits provided by law.

(d) That authority be granted for the giving of notice of hearing by publication thereof once a week for three consecutive weeks in the State, of Columbia, S. C. and the Daily Bond Buyer of New York, N. Y., and by mailing a copy thereof with postage prepaid to all known bondholders.

(e) That all obligations due by Petitioner under its Outstanding Bonds be temporarily postponed pending efforts to implement and effectuate the Plan of Composition or pending the further Order of this Court; and that all owners or holders of any of said Outstanding Bonds or Coupons be temporarily restrained, pending hearing, from instituting and prosecuting and continuing any legal action for enforcement of the Outstanding Bonds and Coupons.

(f) That upon final approval of the Plan of Composition and upon deposit by Petitioner with the Fiscal Agent of required Refunding Bonds, interest then due thereon, and Certificates of Indebtedness to provide an exchange in accordance with the Plan of Composition for all Outstanding Bonds and Coupons whether deposited or not, then and thereupon the Outstanding Bonds shall be fully extinguished, except for purposes of refunding exchange as hereinafter provided, and shall no longer constitute an indebtedness due by Petitioner or any impediment to full validity of the Refunding and Improvement Bonds now being issued.

(g) That upon and subject to approval of the Plan of Composition presented herein, bondholders who have not yet deposited their Outstanding Bonds and Coupons for refunding exchange shall be allowed until two years following the issuance of final decree of approval of the Plan of Composition pursuant to subparagraph f of Section 403, Title 11, U.S.Code, or until the March 1, 1967, regular interest payment date, whichever shall last occur, within which to deposit such Outstanding Bonds and Coupons with the Fiscal Agent for refunding ex-

change pursuant to such approved Plan of Composition, with further provision that after such time all liability of Petitioner under any undeposited Outstanding Bonds and/or Coupons and under any undelivered Refunding Bonds and/or Certificates of Indebtedness deposited with the Fiscal Agent for purposes of refunding exchange shall stand fully extinguished because of the non-deposit of such Outstanding Bonds and Coupons within the time allowed by this Court; and that the Notice of Hearing to be given to all creditors contain proper reference to this provision.

(h) That approval be granted for payment of funds for refunding and extension and improvement costs within the amounts allowed as specified in paragraph 6 of this Petition.

(i) That all costs of this action, including a reasonable fee for Petitioner's counsel, be taxed against Petitioner herein.

(j) That this Court grant such other and further relief as it may deem proper herein.

STATE OF
SOUTH CAROLINA } VERIFICATION
COUNTY OF YORK

Before me personally appeared W. Ben Dunlap, who on oath says that he is Chairman of York County Natural Gas Authority, Petitioner herein, and as such is fully familiar with its affairs; that he is duly authorized to make this verification for and on behalf of Petitioner herein; that he has carefully read the foregoing Petition and knows of his own knowledge that the matters and things therein alleged are true and correct, except as to those matters alleged on information and belief, as to which he verily believes same to be true.

## APPENDIX II

### ORDER APPROVING FILING OF PETITION FOR COMPOSITION

On consideration of the Petition for Approval of Plan of Composition dated August 21, 1964, and duly filed with this Court, and upon careful examination of the certified Exhibits filed therewith and consideration of all matters and things presented at the time of such filing, it appears prima facie that the Petitioner is entitled to the relief sought in the Petition.

Accordingly, and on motion of C. W. F. Spencer, Jr., Petitioner's Attorney, it is ORDERED AND DECREED as follows:

(1) That the Petition for Approval of Plan of Composition is hereby approved as properly filed pursuant to the requirements of law and in good faith.

(2) That it appears primae facie, and subject to final hearing, that some 85% of the affected creditors, representing substantially more than the required percentage thereof, have approved the Plan of Composition in writing, that the plan is fair and equitable and should be approved and that any failure to approve same could create serious inequity between creditors of the same class.

(3) That the Court hereby fixes a hearing on the Petition herein to be held in the Federal Courtroom at Greenville, S. C., on the 30th day of October, 1964, at 10:30 o'clock A.M., or as soon thereafter as is convenient to the Court; that creditors affected by the plan who desire to controvert any material allegations of the Petition, and set up any objection thereto may file Answer with the Court at any time not less than ten (10) days prior to the date fixed for hearing of said Petition.

(4) That Notice of Hearing shall be given by and in the name of Petitioner substantially in accordance with the attached form of notice which shall be published once a week for three consecutive weeks in the State, Columbia, S. C. and the Daily Bond Buyer, New York, N. Y., and which shall be forwarded by regular mail with postage prepaid to all known bondholders at their present or last known addresses, whether or not their bonds have been deposited with the Fiscal Agent.

(5) That all obligations due by Petitioner under its Outstanding Bonds be

temporarily postponed pending efforts to implement and effectuate the Plan of Composition or pending the further Order of this Court; and that all owners or holders of any of said Outstanding Bonds or Coupons be temporarily restrained, pending hearing, from instituting and prosecuting and continuing any legal action for enforcement of said Outstanding Bonds and Coupons.

(6) That subject to final approval of the Plan of Composition, and upon implementation thereof through deposit by Petitioner with Citizens and Southern National Bank of South Carolina, at Columbia, S. C., as Fiscal Agent and as Exchange Agent, of required Refunding Bonds, interest due thereon and Certificates of Indebtedness to provide an exchange in accordance with the Plan of Composition for all Outstanding Bonds and Coupons, whether deposited or not, then and thereupon the Outstanding Bonds shall be fully extinguished and shall no longer constitute an indebtedness due by Petitioner or any impediment to full validity of the Refunding and Improvement Bonds now being issued; provided that said Outstanding Bonds and Coupons shall nevertheless be acceptable for purposes of refunding exchange only, during the additional time allowed therefor under the provisions of paragraph (7) of this Order.

(7) That upon and subject to final approval of the Plan of Composition, bondholders who have not yet deposited their Outstanding Bonds and Coupons for refunding exchange shall be allowed until two years following the issuance of final decree of approval of the Plan of Composition pursuant to subparagraph f of Section 403, Title 11, U.S.Code, or until the March 1, 1967, regular interest payment date, whichever shall last occur, within which to deposit such Outstanding Bonds and Coupons with the Citizens and Southern National Bank of South Carolina, at Columbia, S. C., as Fiscal Agent and as Exchange Agent for refunding exchange pursuant to the approved Plan of Composition, provided that after such date all liability of Petitioner under any undeposited Outstanding Bonds and/or Coupons and under any undelivered refunding Bonds and/or Certificates of Indebtedness deposited with the Fiscal Agent for purposes of refunding exchange shall stand fully extinguished because of the nondeposit of such Outstanding Bonds and Coupons within the time allowed by this Court; that any such extinguished Refunding Bonds and/or Certificates of Indebtedness held by the Fiscal Agent shall be voided and delivered to Petitioner; and that due notice of this provision be contained in the Notice of Hearing.

(8) That remaining steps to be taken pursuant to the prayer of the Petition herein are (a) final hearing on the Petition and action after hearing on final approval thereof; (b) approval of all costs of the Plan of Composition; (c) approval of all costs of this action, including a reasonable fee for Petitioner's Attorney; and (d) the granting of such other and further relief as the Court may deem proper.

(9) That the foregoing Order represents an interlocutory decree issued pursuant to the provisions of Title 11, Section 401 et seq., United States Code, and same is subject in all regards to issuance of final decree after hearing pursuant to Notice as required hereby.

All of which is duly ordered.

## NOTICE OF HEARING

NOTICE is hereby given that the undersigned Authority, a body politic, has filed a Petition with the United States District Court for the Western District of South Carolina, pursuant to Title 11, Chapter 9, U.S.Code, seeking Court approval of a Plan of Composition already approved on a voluntary basis by approximately 85% of the affected creditors holding Revenue bonds or Coupons, Series of 1957, 1958, 1959 and 1960, heretofore issued by said Authority; that the Court has granted primae facie approval of said Petition and has fixed a hearing thereon to consider final approval thereof to be held at the Federal Courtroom in Greenville, S. C., on the 30th day of

October, 1964, at 10:30 o'clock, A.M., or as soon thereafter as convenient to the Court; that any creditor of Petitioner affected by the plan may file Answer to the Petition at any time not less than ten days prior to the date fixed for hearing thereof with the Clerk of the Court aforesaid at Greenville, S. C.; that under the Plan of Composition creditors holding undeposited Outstanding Bonds or Coupons are allowed until two years following the issuance of final decree of approval of the Plan of Composition pursuant to subparagraph f of Section 403, Title 11, U.S.Code, or until the March 1, 1967, regular interest payment date, whichever shall last occur, within which to deposit such Outstanding Bonds and Coupons for refunding exchange with the Citizens and Southern National Bank of South Carolina at Columbia, S. C., as Fiscal Agent, preferably by use of deposit forms furnished by the Fiscal Agent upon request therefor; that Outstanding Bonds or Coupons undeposited by such date shall thenceforth be null and void; and that all affected creditors are required to enforce the obligations held by them in this proceeding and before this Court.

DONE pursuant to Order of the United States District Court for the Western District of South Carolina.

## APPENDIX III

### ORDER

Originally filed August 25, 1964, together with specific and pertinent exhibits, Petition of York County Natural Gas Authority described in detail, and by reference to exhibits, its reasons for justifying an Order approving Filing of Petition for Composition under provisions of Title 11, § 403 et seq., United States Code, as amended. This Court, by Order of the same date, approved the Petition as properly filed, and, pursuant to statutes governing same, ordered Notice to affected creditors, stayed or postponed pendente lite any action of secured (bond) creditors, and directed other activities incidental to the alleged purpose of the original Petition for Composition.

Upon affidavit that 85% of the affected creditors holding Revenue Bonds or Coupons of the series affected, had approved such Petition in accordance with statute the Court fixed a hearing to consider final approval thereof to be held at the Federal Courtroom, United States District Court for the Western District of South Carolina, Greenville, S. C., on the 30th day of October 1964 at 10:30 o'clock A.M. for purposes of hearing, protest, answer, or other presentation, in accordance with statute law applicable to any creditors holding outstanding, even though undeposited, Bonds or Coupons of said authority for the years in question and duly noticed.

This Court is bound by the statutory directives, limitations and procedures adopted by Congress to effect, and facilitate, debt composition in such cases, particularly Title 11 U.S.C.A. § 403, which provides in part:

"(b) Upon approving the petition as properly filed, or at any time thereafter, the judge shall enter an order fixing a time and place for a hearing on the petition, which shall be held within ninety days from the date of said order, and shall provide in the order that notice shall be given to creditors of the filing of the petition and its approval as being properly filed, and of the time and place for the hearing. The judge shall prescribe the form of the notice, which shall specify the manner in which claims and interests of creditors shall be filed or evidenced, on or before the date fixed for the hearing. The notice shall be published at least once a week for three successive weeks in at least one newspaper of general circulation published within the jurisdiction of the court, and in such other paper or papers having a general circulation among bond dealers and bondholders as may be designated by the court, and the judge may require that it may be published in such other pub-

lication as he may deem proper. The judge shall require that a copy of the notice be mailed, postage prepaid, to each creditor of the petitioner named in the petition at the address of such creditor given in the petition, or, if no address is given in the petition for any creditor and the address of such creditor cannot with reasonable diligence be ascertained, then a copy of the notice shall be mailed, postage prepaid, to such creditor addressed to him as the judge may prescribe. All expense of giving notice as herein provided shall be paid by the petitioner. The notice shall be first published, and the mailing of copies thereof shall be completed, at least sixty days before the date fixed for the hearing.

"At any time not less than ten days prior to the time fixed for the hearing, any creditor of the petitioner affected by the plan may file an answer to the petition controverting any of the material allegations therein and setting up any objection he may have to the plan of composition. The judge may continue the hearing from time to time if the percentage of creditors required herein for the confirmation of the plan shall not have accepted the plan in writing, or if for any reason satisfactory to the judge the hearing is not completed on the date fixed therefor. At the hearing, or a continuance thereof, the judge shall decide the issues presented and unless the material allegations of the petition are sustained shall dismiss the proceeding. If, however, the material allegations of the petition are sustained, the judge shall classify the creditors according to the nature of their respective claims and interest: *Provided, however,* That the holders of all claims, regardless of the manner in which they are evidenced, which are payable without preference out of funds derived from the same source or sources shall be of one class. The holders of claims

for the payment of which specific property or revenues are pledged, or which are otherwise given preference as provided by law, shall accordingly constitute a separate class or classes of creditors.

"At the hearing or a continuance thereof the judge may refer any special issues of fact to a referee in bankruptcy or a special master for consideration, the taking of testimony, and a report upon such special issues of fact, if the judge finds that the condition of his docket is such that he cannot take such testimony without unduly delaying the dispatch of other business pending in his court, and if it appears that such special issues are necessary to the determination of the case. Only under special circumstances shall references be made to a special master who is not a referee in bankruptcy. A general reference of the case to a master shall not be made, but the reference, if any, shall be only in the form of requests for findings of specific facts.

"The court may allow reasonable compensation for the services performed by such referee in bankruptcy or special master, and the actual and necessary expenses incurred in connection with the proceeding, including compensation for services rendered and expenses incurred in obtaining the deposit of securities and the preparation of the plan, whether such work may have been done by the petitioner or by committees or other representatives of creditors, and may allow reasonable compensation for the attorneys or agents of any of the foregoing: *Provided, however,* That no fees, compensation, reimbursement, or other allowances for attorneys, agents, committees, or other representatives of creditors shall be assessed against the petitioner or paid from any revenues, property, or funds of the petitioner except in the manner and in such sums, if any,

as may be provided for in the plan of composition. An appeal may be taken from any order making such determination or award to the United States court of appeals for the circuit in which the proceeding under this chapter is pending, independently of other appeals which may be taken in the proceeding, and such appeal shall be heard summarily.

"Such compensation of referees in bankruptcy and special masters shall not be governed by section 68 of this title.

"On thirty days' notice by any creditor to petitioner, the judge, if he finds that the proceeding has not been prosecuted with reasonable diligence, or that it is unlikely that the plan will be accepted by said proportion of creditors, may dismiss the proceeding.

"*Ancillary injunctions; preliminary stay of other proceedings—* (c) Upon entry of the order fixing the time for the hearing, or at any time thereafter, the judge may upon notice enjoin or stay, pending the determination of the matter, the commencement or continuation of suits against the petitioner, or any office or inhabitant thereof, on account of the securities affected by the plan, or to enforce any lien or to enforce the levy of taxes or assessments for the payment of obligations under any such securities, or any suit or process to levy upon or enforce against any property acquired by the petitioner through foreclosure of any such tax lien or special assessment lien, except where rights have become vested, and may enter an interlocutory decree providing that the plan shall be temporarily operative with respect to all securities affected thereby and that the payment of the principal or interest, or both, of such securities shall be temporarily postponed or extended or otherwise readjusted in the same manner and upon the same terms as if such plan had been finally confirmed and put into effect, and upon the entry of such decree the principal or interest, or both, of such securities which have otherwise become due, or which would otherwise become due, shall not be or become due or payable, and the payment of all such securities shall be postponed during the period in which such decree shall remain in force, but shall not, by any order or decree, in the proceeding or otherwise, interfere with (a) any of the political or governmental powers of the petitioner; or (b) any of the property or revenues of the petitioner necessary for essential governmental purposes; or (c) any income-producing property, unless the plan of composition so provides.

"Any agency or instrumentality referred to in section 401 of this title may file a petition for a preliminary stay with the court referred to in subsection (a) of this section stating (a) that the petitioner is insolvent or unable to meet its debts as they mature; (b) that it desires to effect a plan for the composition of its debts, a copy of which is filed and submitted with the petition; (c) that a creditor of the petitioner holding a security affected by the plan or a person claiming to be such a creditor (naming him and giving his address and the name and address of his attorney of record, if any), is attempting or threatening to obtain payment of said security in preference to other creditors by means of the commencement or continuation of a suit or process of the class hereinbefore in this subsection described; (d) that efforts are being made in good faith to the end that creditors of the petitioner owning not less than 51 per centum in amount of the securities affected by the plan (excluding, however, any such securities owned, held, or controlled by the petitioner) shall accept it in writing; (e) that there is a reasonable prospect of such ac-

ceptance within a reasonable time; (f) that upon such acceptance the petitioner intends to file a petition under subsection (a) of this section; and (g) that the petitioner prays that the judge will upon notice enjoin or stay the commencement or continuation of said suit or process. A single petition may seek the preliminary stay of several suits or processes brought or threatened by the same or different creditors or persons claiming to be creditors. The petition shall be accompanied by the filing fee required in subsection (a) of this section, unless such fee shall have been paid upon the filing of an earlier petition for a preliminary stay involving the same plan, and no further fee shall be required upon the subsequent filing of a petition under subsection (a) of this section. Upon such petition the judge shall fix a time and place for hearing and direct that notice thereof shall be given in such manner as he shall prescribe to said creditor or person claiming to be a creditor and to any other person deemed by him to be interested. After such hearings, and upon being satisfied of the truth of the allegations of the petition, the judge may, in his discretion, except where rights have become vested, enjoin or stay the commencement and continuation of said suit or process until a date fixed by him in his order not exceeding sixty days from the date of entry thereof. The judge shall retain jurisdiction to vacate such injunction or stay, or to extend the period thereof for one additional period of not exceeding sixty days, upon good cause shown.

"(d) The plan of composition shall not be confirmed until it has been accepted in writing, by or on behalf of creditors holding at least two-thirds of the aggregate amount of claims of all classes affected by such plan and which have been admitted by the petitioner or allowed by the judge, but excluding claims owned, held, or controlled by the petitioner: *Provided, however,* That it shall not be requisite to the confirmation of the plan that there be such acceptance by any creditor or class of creditors (a) whose claims are not affected by the plan; or (b) if the plan makes provision for the payment of their claims in cash in full; or (c) if provision is made in the plan for the protection of the interests, claims, or lien of such creditors or class of creditors."

Except for the direction, the authority quoted, this Court has no jurisdiction herein.

Now comes Petitioner to aver (and until hearing this Court must accept the Petition at face value), that he is the owner of certain Bonds, that he received no prior notice of this proceeding although a known bondholder-creditor, that he is dissatisfied with the proposed Plan of Composition, and that he proposes an alternate plan suggested by others (not specified as creditors or bondholders) which he avers is better designed for protecting Petitioner and/or other bondholders. He cites the potential he subscribes allegiance to as Carolina Pipeline Company, not heretofore identified with the Plan of Composition as creditor, or approved source of relief, or a party of interest to the proposed plan, pleading the same as the source of guarantee of his security, his solvency as creditor, insofar as his investment is concerned.

Petitioner, of course, must have his day in Court.

The hearing set for October 30, 1964 could not, in justice, nor in compliance with statute law be postponed at this date.

Petitioner has averred that his interest may be materially affected; proof must follow.

In accordance with the statute law cited above, the hearing so fixed for October 30, 1964 was done pursuant to Section 403, sub. b, supra, which spe-

cifically provides that upon the filing of a petition by a public agency seeking a composition with the holders of its securities, "the judge shall enter an order fixing a time and place for a hearing on the petition, which shall be held within ninety days from the date of said order, and shall provide in the order that notice shall be given to the creditors of the filing of the petition and its approval as being properly filed, and of the time and place for the hearing."

The statute further provides that "the notice shall be published at least once a week for three consecutive weeks * * and that a copy of the notice be mailed, postage prepaid, to each creditor of the petitioner named in the petition at the address of such creditor given in the petition * * *." And it is finally provided that "the notice shall be first published, and the mailing of copies thereof shall be completed, at least sixty days before the date fixed for the hearing."

Thus the statute has fixed the time table and affords no discretion in the matter to the District Court. As a consequence, I must of necessity deny the request of petitioner, James P. Mozingo, III, for a postponement of the hearing date to November 30, 1964.

The statute does give a remedy to a dissenting bondholder. It provides that "at any time not less than ten days prior to the time fixed for the hearing, any creditor of the petitioner affected by the plan may file an answer to the petition controverting any of the material allegations therein and setting up any objection he may have to the plan of composition."

It is, of course, clear from the petition now before me that it reflects a dissent to the plan of composition submitted by the debtor petitioner. Accordingly, it seems proper that the Court should treat the petition of the petitioner, James P. Mozingo, III, as an answer to the petition of York County Natural Gas Authority, timely filed, and it will be so treated as supplemented by any further answer filed by said petitioner. The Petitioner, James P. Mozingo, III, will be accorded all rights granted by the statute to any objecting bondholder at the hearing which will be held in Greenville, South Carolina, at 10:30 A.M. on Friday, October 30, 1964.

This Court will, upon proper showing, take such further action as the justice of the cause may direct.

And it is so ordered.

### Appendix IV

Proceeding for composition of indebtedness of York County Natural Gas Authority as represented by certain outstanding revenue bonds now admittedly in default.[1] Issues arise by objection of certain bondholders.[2]

Originally filed August 25, 1964, together with specific and pertinent exhibits, Petition of York County Natural Gas Authority described in detail, and by reference to exhibits, its reasons for justifying an Order approving Filing of Petition for Composition under provisions of Title 11, § 403 et seq. United States Code, as amended. This Court, by Order of the same date, approved the Petition as properly filed, and pursuant to statutes governing same, ordered Notice to affected creditors, stayed or postponed pendite lite any action of secured (bond) creditors, and directed other activities incidental to the alleged purpose of the original Petition for Composition.

Upon affidavit that 85% of the affected creditors holding Revenue bonds or coupons of the series' affected, had approved such Petition in accordance with statute, the Court fixed a hearing to consider final approval thereof to be held at the Federal courtroom, United States Disrict Courts for the Western District of South Carolina, Greenville, S. C., on the 30th day of October 1964 at 10:30

---

1. See Title 11 § 403 U.S.Code.

2. Originally Senator J. P. Mozingo, Esq., submitted a list of 78 bondholders whom he represented as protestants—comprising 20–30% of outstanding bonds.

o'clock, A. M., for purposes of hearing, protest, answer, or other presentation, in accordance with statute law applicable to any creditors holding outstanding, even though undeposited, Bonds or Coupons of said authority for the years in question and duly noticed.

Subsequent hearings at which testimony was taken and issues fully explored raised additional questions of the validity of the consents of a number of bondholders who allegedly approved the plan submitted by the Authority, and other questions for the Court.

Outstanding indebtedness sought to be refinanced include:

(a) $2,762,000 of Natural Gas System Revenue Bonds, dated September 1, 1957. Such bonds are in denomination of $1,000 each and are numbered in order of their maturities from 1 to 2,762, inclusive.

(b) $450,000 of Natural Gas System Revenue Bonds, Series of 1958, dated September 1, 1958. Such bonds are in denomination of $1,000 each and are numbered in order of their maturities from 1 to 450, inclusive.

(c) $422,000 Natural Gas System Revenue Bonds, Series of 1959, dated July 1, 1959. Such bonds are in denomination of $1,000 each and are numbered in order of their maturities from 1 to 422, inclusive.

(d) $144,000 Natural Gas System Revenue Bonds, Series of 1960, dated October 1, 1960. Such

bonds are in denomination of $1,000 each, and are numbered in order of their maturities from 1 to 144, inclusive.

(e) In addition, the Authority is indebted to the extent of $95,758 for moneys advanced to it by certain of those who purchased the outstanding bonds used by the Authority.

On April 16, 1964, Petitioner duly adopted a bond resolution authorizing, subject to approval of bondholders as required by statute, and by the Court, the refunding of the outstanding bonds of the Authority,[3] now contemplated to be accomplished by the issuance of an exact number of Series A and Series B bonds to be issued within the combined total of $4,300,000, alleged to be constituted by $3,778,000 of Series A bonds and $522,000 of Series B bonds upon conditions set forth in the Plan of Composition.

In order to present the plan for consent of the outstanding bondholders Petitioner directed literature, letter, and information to each known,[4] and a letter of transmittal included for consent to surrender of the outstanding bonds in exchange for the new bonds. Citizens and Southern National Bank of South Carolina, Columbia, South Carolina, was named and designated transfer agent or exchange agent.

The outstanding bonds are bearer bonds. Uncontradicted testimony shows that numbers of bondholders surrendered bonds to the transfer agent to accomplish the Plan of Composition with their consent, as evidenced in the letter of transmittal.[5]

---

3. The S.C. General Assembly had granted permission by Act passed 1964.

4. Counsel Mozingo avers he was purposely overlooked and unadvised.

5. "The undersigned, a holder of the following described York County Natural Gas Authority Revenue Bonds:

 \* \* \* \* \*

which Bonds, with interest coupons due September 1, 1961 and thereafter, as to the Bonds of 1957, 1958 and 1959, and

with interest coupons due March 1, 1963 and thereafter, as to the Bonds of 1960, are enclosed herewith, hereby agrees to the exchange of said Bonds for (1) the same principal amount of an issue of new 4–4½% Natural Gas System Revenue Bonds of York County Natural Gas Authority, South Carolina, dated March 1, 1964, and all maturing March 1, 1994, bearing approximately the same serial number(s) as the Bonds herewith enclosed, and (2) junior lien non-

The Court seeks, as a matter of equity and convenience, a suitable procedure to accomplish transfer of title to the bonds, by those who desire to transfer, subject to all existing equities in and as a final result of this proceeding and any review thereof. In such transfer notice to purchaser(s) or subsequent purchaser(s) of the pendency of this proceeding, and of its possible effect upon the bond being transferred, or the value thereof shall be assured.

Bonds favoring Petitioner's plan or an alternate plan as proposed by Counsel Mozingo, and others, known as the Carolina Gas Pipeline Plan, have been deposited with Citizens & Southern National Bank of South Carolina, as fiscal agent or transfer agent, accompanied by an indication of which plan the respective depositing bondholder favors. The Court has proceeded in reliance upon the number of bonds deposited and the number of assents to one plan or another. Bonds so deposited are in effect in custodia legis pending final disposition by the Court. After action by the District Court, now imminent, further delay before final disposition pending ruling upon any appeal or appeals could be encountered.

Meanwhile, occasions have and may hereafter arise in which some bondholder finds it necessary to seek transfer of his bonds. As all of the bonds in question are bearer bonds transferable by delivery, unless registered, which is not the case as to most of the bonds, it could lead to considerable confusion and possible misunderstanding if bonds now deposited with the fiscal agent were withdrawn and transferred without notice of such rights, equities or liabilities as

interest bearing registered Certificates of Indebtedness in an amount equal to the past due and unpaid interest coupons attached to the Bonds delivered for exchange. The new Bonds will be accompanied by the approving legal opinion of Messrs. Sinkler, Gibbs and Simons, Attorneys, Charleston, South Carolina, and will be substantially as described in the accompanying Memorandum.

might be extant concerning such bonds based on the type of assent or objection to composition filed by the present holder and based on final disposition of the pending proceeding for composition. Accordingly, it appears reasonable and necessary that physical withdrawal of bonds from deposit with the fiscal agent should not be permitted pending and until final action by the Court in this proceeding.

A hearing was held before the United States District Court, Western District of South Carolina, Rock Hill Division, at Rock Hill, South Carolina, January 23, 1965 for the purpose of determining the feasibility of a plan to effect a sale of the bonds without requiring physical transfer by the fiscal agent (transfer agent). At the hearing counsel for Petitioner and for bondholders protesting Petitioner's (Senator Mozingo) plan were present and were heard by the Court. After a full discussion, no disagreement was voiced to the procedure now encompassed in this Order.

It is therefore ordered and decreed as follows:

1. That bonds on deposit with the fiscal agent may be sold and transferred subject to all existing equities growing out of and as a result of this proceeding.

2. That physical delivery of any bonds so sold shall not be made.

3. That the fiscal agent shall be given notice in writing of any transfer of any bonds deposited with it, subject to any existing equities on account of this proceeding, and shall acknowledge such transfer in writing to the purchaser.

4. Thereafter the fiscal agent shall deal with the purchaser in like manner as if he were the initial depositor.

"In accepting the above old Bonds for exchange, it is understood that you will act solely as Exchange Agent and that you assume no responsibility for any recommendation, representation or statement issued by the Authority or its Investment Bankers.

"You will deliver such new Bonds and Certificates to the undersigned owner of the old Bonds at the following address and in the following manner:"

5. No transferee of bonds pursuant to this order may make physical withdrawal thereof from the fiscal agent pending and until the final outcome of this proceeding and the further Order of the Court herein, and neither the original depositor nor any subsequent transferee may change or withdraw any assent or objection to any plan of composition heretofore filed with this Court, pending and until final action by the Court upon the assents and/or objections previously filed, except upon further Order of the Court herein for proper cause shown.

6. That the fiscal agent shall keep a permanent transfer ledger or account book in which all transfers shall be registered pendente lite, and same shall thereupon and thereafter be a part of the official record of this Court in this proceeding.

7. That the fiscal agent shall have prepared a transfer form, the original of which shall be to accomplish a transfer when and if exhibited to the fiscal agent *along with our executed, attested copy thereof, which* copy shall be deposited with the fiscal agent. The fiscal agent, for a nominal fee covering cost of printing, servicing and mailing, shall furnish such forms to known bondholders. The form shall be as follows:

### TITLE TRANSFER

York County Natural Gas Authority.
Bond(s) No. ＿＿＿＿＿＿ of the year 19＿＿.

I ＿＿＿＿＿＿＿＿ owner, and holder (the Fiscal Agent, Citizens and Southern National Bank, Columbia, S. C. holds possession subject to title evidence as to true ownership) for valuable consideration, sell, transfer and convey, all my right, title and interest in the above bonds of York County Natural Gas Authority to ＿＿＿＿＿＿ or assigns this the ＿＿＿ day of ＿＿＿＿ 1965.

Transfer is subject to present and final proceedings in Case No. B2075, now pending in the U. S. District Court for the Western District of South Carolina, Rock Hill Division, and any appeal therefrom, upon Petition of the Authority in the cause entitled "Ex Parte, York County Natural Gas Authority, Petitioner: In Re: Outstanding Bonds, Series of 1957, 1958, 1959, and 1960, Payable Solely from Revenues", and to the Order of the said United States District Court, dated January 27, 1965 authorizing transfer of Title, but not possession *pendente lite*, by this method.

Witness my Hand and Seal the day, month and year above.

(L.S.)
＿＿＿＿＿＿＿＿＿＿＿＿
Bondholder

Attested and acknowledged before me this＿＿＿＿＿ day of ＿＿＿＿ 19＿＿.

＿＿＿＿＿＿＿＿＿＿＿＿
(Seal)
Notary Public for South Carolina

Registered as ordered ＿＿＿＿ 19＿＿.

Citizens & Southern National Bank of Columbia, South Carolina.

By: ＿＿＿＿＿＿＿＿＿＿＿

Nothing herein shall prejudice rights of the parties as to the issues of the cause.

All of which is duly ordered.